IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MCNIDER MARINE, LLC and JOHN BRUCE MCNIDER,<br><br>                      Plaintiffs,<br><br>v.<br><br>YELLOWSTONE CAPITAL, LLC, YITZHAK STERN, ARCA FUNDING, LLC, MCA RECOVERY, LLC,<br><br>                      Defendants. | DOCKET NO.:<br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND DEMAND FOR A TRIAL BY JURY

Plaintiffs McNider Marine, LLC and John Bruce McNider (collectively "McNider"), by their attorneys, White and Williams LLP, as and for their complaint and demand for a trial by jury, allege:

## NATURE OF THE ACTION

1.     This is an action to save a small Alabama business from financial ruin and to prevent Defendants from continuing to engage in the type of predatory lending practices that have been condemned by consumer groups and Attorney Generals around the country.

2.     McNider is a small marina that has been in the business of selling and repairing boats for more than a decade.  It is owned by Bruce McNider and his wife, Melissa McNider. Both have lived in Alabama their entire lives, and have never set foot in New York.

3.     Defendant Yellowstone Capital, LLC ("Yellowstone"), led by Defendant Yitzhak Stern, a.k.a. Isaac Stern ("Stern") has charged unlawful and unconscionable interest rates that

they knew or should have known would ultimately cripple Plaintiffs' business and cause financial ruin to Mr. McNider and his family.

4.    The scheme involves Yellowstone advancing funds to McNider (and others), through their broker, Defendant Arca Funding, LLC ("Arca"), pursuant to so-called merchant cash advance agreements.

5.    Once Plaintiffs began to miss payments, Defendant MCA Recovery, LLC ("MCA Recovery") would make further attempts at collection.

6.    The terms and conditions of the agreements are wholly misleading, and intentionally designed to disguise the true nature of the transaction so that they do not appear to violate the criminal usury laws of various states.

7.    As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses.[1] It's a high-risk market, and interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's." *Id.*

8.    In June of 2017, Congressman Emanuel Cleaver, II, launched an investigation of small business financial technology ("FinTech").

9.    Congressman Clever was "particularly interested in payday loans for small businesses, also known as 'merchant cash advance.'"[2]

10.    He expressed concern that "some FinTech lenders may be trapping small business owners in cycles of debt..."

11.    The National Consumer Law Center came to the same conclusion:

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[2] Scott M. Pearson, *House Member Launches FinTech Lending Investigation*, CONSUMER FINANCE MONITOR (June 26, 2017), https://www.consumerfinancemonitor.com/2017/06/26/house-member-launches-fintech-lending-investigation/.

Merchant cash advances operate very similarly to payday loans and have similar problems. A lump sum of cash is taken out as an advance on a borrower's future sales. The merchant then pays back this balance in addition to an expensive premium through automatic deductions from the merchant's daily credit card or debit card sales or from its bank account.[3]

12.     As reported by CNN, "[m]any business owners take out new advances in order to pay off outstanding balances on previous advances, plunging them into a cycle of debt."[4]

13.     According to the Consumer Financial Protection Bureau, over 19 million U.S. households resort to payday loans. Of that number, almost 70% of borrowers have to take out a second loan to cover the first, and 20% end up saddled with 10 or more loans, one after the other.

14.     The New York State Department of Financial Services has recognized "the harmful impact of high-interest payday loans that trap consumers in a cycle of increasing debt and predatory collection practices," and has vowed "to protect New Yorkers from unscrupulous practices and [] oppose any attempt to evade New York's laws."[5]

15.     The New York Attorney General's Office has also acknowledged the damage these loans do, stating: "[a]lthough many of these companies profess to offer cash-strapped consumers much needed access to loans, they typically charge exorbitant interest rates that essentially force struggling consumers to roll over one payday loan into another and that trap consumers in a vicious, never ending cycle of high-cost borrowing that they can never repay."[6]

---

[3] National Consumer Law Center, Comments to the Comptroller of the Currency Office of the Comptroller of the Currency on *Exploring Special Purpose National Bank Charters for Fintech Companies*, National Consumer Law Center (Jan. 17, 2017)http://www.nclc.org/images/pdf/banking_and_payment_systems/ fintech/comments-fintech-jan2017.pdf..

[4] Octavio Blanco, *Controversial Cash Advances Come At A High Cost To Small Businesses*, CNNMONEY (Dec. 1, 2016, 2:28 PM), http://money.cnn.com/2016/12/01/news/economy/merchant-cash-advance/index.

[5] Letters from Maria T. Vullo, Superintendent, New York State Department of Financial Services, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017 and April 14, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-nys-dept-financial-services.pdf.

[6] Letter from Jane M. Azia, Bureau Chief, Consumer Frauds and Protection, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-ny-atty-general.pdf.

16.     Attorney Generals of other states have echoed the same public policy concern in bringing enforcement action against payday lenders:  "These companies targeted thousands of financially-stressed consumers in need of a loan, and charged exorbitant interest rates and fees, causing these consumers and their families to incur even greater economic strain....We are pleased to have worked with the Division of Banks in order to obtain significant restitution for consumers who were harmed, and permanently stop these lenders from doing business in Massachusetts."[7]

17.     Yellowstone is the commercial equivalent of a payday lender.

18.     Yellowstone's scheme is designed to trap a small business in a cycle of never ending debt so that Defendants can reap as much profit as quickly as possible.

19.     Yellowstone knew that in order for McNider to pay the usurious interest rates it charged, McNider had to enter into subsequent usurious and unconscionable agreements with the same or different MCA companies.

20.     The foreseeable consequence of Defendants' actions was the devastation of an otherwise profitable business.

21.     As one small business protection advocate has put it, MCA companies, like Yellowstone, are "in the business of helping [small] businesses fail." *Bloomberg, supra.*

## THE PARTIES

22.     Plaintiff McNider Marine, LLC is an Alabama limited liability company with its principal place of business located at 30160, Suite 1, Highway 43, Thomasville, Alabama 36784.

---

[7] Attorney General of Massachusetts, *Unlicensed Lenders to Refund Millions to Consumers Over Illegal Online Lending Scheme*, OFFICIAL WEBSITE OF THE ATTORNEY GENERAL OF MASSACHUSETTS (Oct. 29, 2015), http://www.mass.gov/ago/news-and-updates/press-releases/2015/2015-10-29-unlicensed-lenders.html.

John Bruce McNider and Melissa McNider are the only two members of McNider Marine, LLC, and both are residents and citizens of Alabama.

23.     Plaintiff John Bruce McNider is an individual who is a resident and citizen of Alabama and who, along with Melissa McNider, resides at 1505 Lake Wood Drive, Thomasville, Alabama 36784.

24.     Defendant Yellowstone Capital, LLC is a limited liability company duly organized and existing under the laws of the State of New Jersey with its principal offices located at 1 Evertrust Plaza, Jersey City, New Jersey 07302.  Its sole LLC member is a citizen of Delaware.

25.     Defendant Yitzhak Stern (a.k.a. Isaac Stern) is the President and sole owner of Yellowstone, and an adult resident and citizen of Hillside, New Jersey.

26.     Defendant MCA Recovery, LLC, is a limited liability company organized and existing under the laws of the State of New York with a Registered Agent and DOS Process address c/o Business Filings Incorporated, 187 Wolf Road, Albany, New York 12205. Upon information and belief, each of MCA Recovery's LLC members is a New York citizen.

27.     Defendant Arca Funding, LLC is a limited liability company duly organized and existing under the laws of the State of New York with its principal offices located at 1222 Ave. M, Suite 406, Brooklyn, New York.  Upon information and belief, each of its LLC members is a New York citizen.

## JURISDICTION AND VENUE

28.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed

itself of the laws of New York for the specific transactions at issue, or has selected New York as the forum for all disputes related to the transactions.

29.     This Court has original jurisdiction based upon 28 U.S.C. § 1332(a) because no Plaintiff is a citizen of the same state as Defendant and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

30.     This Court also has jurisdiction under 28 U.S.C. § 2201 *et. seq.*

31.     Venue is proper because each Defendant regularly conducts business within this judicial district.

## FACTUAL BACKGROUND

**A.     Overview of the Defendants' Unlawful Scheme.**

32.      Yellowstone is not regulated by the government and the fees, penalties, and rates are not subject to any regulatory oversight.

33.     Yellowstone uses this lack of regulatory oversight to evade state usury laws by creating agreements that are wholly misleading, and intended to deceive courts around the country into believing the agreements do not constitute loan transactions.

34.     As noted by an industry insider, however, these transactions operate in the same manner as loans: "Depending on the state, the financing is technically either a loan or merchant cash advance, but the mechanics of the financing are the same as an MCA regardless."[8]

35.     Ultimately, when small businesses cannot satisfy the usurious and oppressive terms of the merchant cash advances, they default, the merchant cash advance companies, and the collection companies that serve them, quickly obtain judgments, attempt to liquidate the

---

[8] Sean Murray, *Merchant Cash Advance Redefined*, DEBANKED, http://debanked.com/2012/03/merchant-cash-advance-redefined/.

assets of the business and its owner(s) to repay the amounts due under their agreements, and use threats of further economic loss or personal embarrassment to extract payouts.

36.     At this point, however, the principal amounts of the advances have long been repaid and the merchant cash advance companies are destroying the small businesses to collect usurious interest rates and high fees charged under the successive loans.

**B.     The So-Called "Merchant Agreements" are Disguised Loans**

37.     Since at least 2014, McNider has been besieged by MCA companies.

38.     As a result of the immense financial stress put on the company by these predatory lenders, McNider was forced to enter into two agreements with Yellowstone in 2016: one on July 20, 2016 (the "July Agreement") and the other on October 19, 2016 (the "October Agreement") (collectively the "Agreements"). True and correct copies of the Agreements are attached hereto as Exhibits A and B respectively.

39.     These deals were brokered by Arca Funding.

40.     The July Agreement was funded by Yellowstone and "Team AKB" (comprised of Yellowstone employees known as "Lock Box Steve" and "Licker," who upon information and belief, funded the Agreement with their personal funds).

41.     Subsequent agreements were used to repay Yellowstone's and Team AB's July funding, ensuring they were protected from McNider's impending collapse.

42.     In an effort to disguise the criminally usurious nature of these transactions, Yellowstone used a common instrument that purports to be a "merchant agreement." The Agreements (which are unconscionable contracts of adhesion), however, lack all of the hallmarks of a true "merchant agreement." Rather, the Agreements are, in truth, nothing more than a series of collateralized loans provided at unconscionably high interest rates.

43.   McNider, however, did not learn that these transactions were criminally usurious loans until informed by counsel in March 2017.

### The "Daily Payment Amount" is a Disguised "Fixed Loan Payment."

44.   The so-called "merchant agreements" purport to purchase future receivables based on a specified percentage of McNider's daily receivables.  While these agreements give the illusion that the repayment term is directly tied to the percentage of receivables, each of the agreements then alters this daily percentage by fixing a daily repayment amount.  This stated daily repayment amount is purportedly based on a good-faith estimate of McNider's daily future receivables but is, in reality, a knowingly false term unilaterally dictated by Yellowstone in an attempt to avoid the usury laws.

45.   Most notably, internally, Yellowstone noted that these payments were fixed.  In Yellowstone's funding email for the July Agreement, the company noted that the "collection method" for the agreement was to be a "fixed estimated payment" of $2,415; not a payment that varied based on McNider's receivables. A true and correct copy of the funding email is attached hereto as Exhibit C.

46.   Further, when these so called "merchant agreements" are placed side-by-side, it is undisputable that Yellowstone determines the daily payment amount based on the full value of the loan, not the estimated daily future receivables.

47.   Specifically, each daily payment amount was allegedly based on 15% of McNider's daily future receivables.  The specified daily payment for each of these transactions, however, varied from $2,415 to $3,398 in proportion to the amount of the loan, not the so called "good-faith" estimate of what would be 15% the merchant's daily receivables:

| Date | Purchased Price | Purchased Amount | Daily Payment | Daily Percent | Interest Rate |
|------|-----------------|------------------|---------------|---------------|---------------|
| 7/20/2016 | $200,000 | $289,800 | $2,415 | 15% | 240% |
| 10/19/2016 | $250,000 | $373,750 | $3,398 | 15% | 285% |

48.     In reality, these transactions are an unscrupulous pyramid scheme, whereby McNider was pushed toward an unsustainable level of indebtedness in a relatively short period of time, creating circumstances under which Yellowstone and other MCA companies are then permitted to go after the personal assets of the business owner.

49.     In fact, in entering into these transactions, Yellowstone knew that there was no possibility that McNider could have met these daily payment obligations without being forced to enter into a series of further similar transactions because they, and other MCA companies, were taking *almost 90%* of McNider's daily receivables:

| MCA Company | Loan Date | Daily % | Daily Payment |
|-------------|-----------|---------|---------------|
| New Era | 8/11/2016 | 15% | $1,711 |
| Ram Capital | 9/19/2016 | 10% | $1,999 |
| CP | 9/30/2016 | 9% | $1,208 |
| IBIS | 10/6/2016 | 10% | $1,165 |
| Yellowstone | 10/19/2016 | 15% | $3,398 |
| TVT | 10/17/2016 | 15% | $1,499 |
| ML Factors | 10/27/2016 | 10% | $2,476 |
| Funding Metrics | 11/4/2016 | 2% | $530 |
| CP | 11/14/2016 | 3% | $362 |
| **Total Daily** | | **89%** | **$14,348** |

*The Fixed "Daily Percentage" is intended to charge an interest rate in excess of 25%.*

50.     Rather than having the loan repaid based on a fixed daily payment amount, Yellowstone calculated the repayment term based on a fixed daily percentage of receivables.

*The "Purchased Amount" is a Disguised "Repayment of Principal and Interest"*

51.     The purported "Purchase Amount" of the receivables supposedly "purchased" by Yellowstone is also a complete fiction. In each of the Agreements, Yellowstone represented that

the parties agree upon a certain fair market value of the receivables purchased. This purported fair market value, however, is unilaterally dictated by Yellowstone and based on the credit worthiness (or desperation) of the merchant. In contrast, a true merchant agreement determines the fair market value of the receivable based on the credit worthiness of the customer who is expected to pay that receivable.

### The "Purchased Receivables" is not tied to any existing receivables and absolutely no assessment of collectability is conducted of the purported future receivables purchased.

52.     The Agreements are not tied to receivables due on a specific and existing contract for goods already delivered by the merchant to a customer.   Instead, the alleged "merchant agreements" are tied to the "Purchase and Sale of Future Receivables" in generic terms, in effect permitting Yellowstone the right to attach and collect monies from the merchant's banking accounts into which deposits were made related to all "of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts") defined as all payments made . . . for the payment of Merchant's sale of goods or services until the amount specified below (the "Purchase Agreement") have been delivered by Merchant to [Yellowstone]."

53.     In other words, the right to repayment is not tied to the value or money owed to the McNider based on goods or services already provided to a customer who has not yet paid and subsequently purchased by Yellowstone pursuant to a "merchant agreement." Rather, any and all receivables from any customer in any amount based any sale of goods and services by the merchant are sold, assigned and transferred to Yellowstone until such time as the purchase amount stated in the "factoring agreement" is paid in full.

54.    Further, Yellowstone did not take actual possession of the accounts. Instead, McNider continued to collect from his customers and would allow Yellowstone to withdraw the daily payment from McNider's account.

### The "Security Agreements" and Confessions of Judgment provide full recourse in the event of a default or bankruptcy.

55.    The Security Agreement and Guaranty contained in each agreement provides Yellowstone with full recourse in the event of non-payment of the loans.

56.    Under each of the agreements, a default is declared if McNider misses a payment, declares bankruptcy, or admits its inability to pay its debts.

57.    In the event of any one of these defaults, Yellowstone is then permitted to immediately seize the business assets secured under the Security Agreement as well as the personal assets of McNider's private business owners under the Personal Guaranty.

58.    Further, the Agreements provide for recourse even in the event that McNider has no future accounts receivable. In that scenario, the lack of receivables would likely cause McNider to file for bankruptcy, thus triggering default under the Agreements, and allowing Yellowstone to enforce the Security Agreements and Personal Guaranty.

59.    Even more outrageous, Yellowstone is permitted to obtain a Judgment by Confession without even notifying McNider—which it did when McNider could not repay.

60.    Accordingly, the Agreements provide Yellowstone with full recourse even if the business burned down to the ground on day one and no future receivables were ever obtained.

### The purported "True Up" provision is a non-negotiated term that was never intended to be exercised.

61.    The Agreements contain a "true up" provision that purports to reconcile McNider's daily payments based on its actual receivables.  This provision is illusory and is

nothing more than a hidden provision, in purposefully small and unreadable print, designed solely to masquerade Yellowstone's criminal conduct.

62.     This purported "true up" provision was not remotely a negotiated term, and was never intended to be enforced.

63.     In truth, it is nothing more than a hidden provision that Yellowstone hopes its merchants never see, and Yellowstone ensures is not seen by never mentioning it and burying it in the middle of several documents with small print.

64.     In fact, not once did Yellowstone ever reconcile McNider's monthly receivables.

65.     Further, even when merchants are owed money, Yellowstone fails to reconcile the account. As stated by a customer on Yellowstone's Rip Off Report website[9]:

> I borrowed money through a broker in California for my hair salon in Atlanta who went through Yellowstone Capital to get the money financed and then decided to pay off the loan early. I was given a pay off and told what ever money was owed back to me from over paying because of the ach debit where 5 days behind from the withdraw from the bank would be returned that was a month ago. I have called Mike Samuels everyday trying to get my refund and either his secretary Lisa tells me he is unavailable or just left the office or in a meeting. I am tired of the run around and I am tired of them holding my money and making interest of it for a whole month. I know $1200,00 is much to some but to a small business its half a rent payment or all of your utilities for a month. I feel this company has a lack of costumer service and also a lack of pride in their services. They got their money back early and all I am asking for is my money back I over paid. Don't think that is asking to much.
>
> The one thing I have learn from all of this is that fact that all of these funding companies are definately not the way to go to capitalize you business. They are sharks and lie to you and take advantage of hard working business owners who are trying to make a good living during hard times. I will never recomend Yellowstone Capital to any of my friends that own business in the City of Atlanta Ga that is for sure. I hope one day soon I will see my money in my account again. My next step is to contact the State of New York's Attorney Office and file a complaint against this company. I would recommend you do the same. If we all do it maybe they will go out of business or atleast get their act together.

---

[9] Silva and Thomas Hair Studio, Comment on *Yellowstone Capital*, RIPOFFREPORT.COM (Feb. 19, 2014), https://www.ripoffreport.com/reports/yellowstone-capital-trusted-business-ripoff-report-verified-businesses-you-can-trust-yellowstone-capital-dedicated-to-100-customer-satisfaction-the-safe-cash-advance-alternative-when-you-need-money-the-most-yellowstone-capital-cash-advance-expert-team-years-of-industry-experience-dedicated-to-accommodating-all-needs-of-business-owners-yellowstone-capital-the-alternative-business-financing-provider-offering-unlimited-business-funds/internet/yellowstone-capital-mike-samuels-merchant-cash-advance-cash-advance-business-investment-827087.

*The underwriting proves these transactions are loans because only the credit worthiness of McNider is assessed, not the credit worthiness of its "receivables."*

66.     The underwriting of the Agreements further demonstrates that the transactions are loans, not "merchant agreements."

67.     In connection with each of the transactions, Yellowstone reviewed no more than McNider's financial condition, which included the review of its bank statements, tax returns, rental agreements, and credit history.  Yellowstone did not ask for a customer list or a list of account receivables that it was purportedly purchasing.  That is because Yellowstone was not purchasing any receivables at all.  Instead, Yellowstone was advancing McNider a sum of money in exchange for repayment of that principal, as well as monetary consideration for the expected time value of the cash advanced.

**C.     Doomed to Fail**

68.     Yellowstone also did not have any regard for McNider's ability to repay the loans.

69.     This is a practice common to all predatory MCA companies.

70.     The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay.  National Consumer Law Center, *supra*.

71.     Like here, this is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id.*  ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the

collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

72.    Yellowstone only cared about whether they could collect upon default.

73.    Yellowstone knew that their illegal business model would lead to businesses failing, which again they safeguarded through security agreements and personal guarantees.

74.    Indeed, Yellowstone expressly marketed their loans to desperate small businesses with low credit scores that have knowingly taken out other loans with other MCA companies.

75.    Yellowstone knew that there was no way the McNider could repay the loans with its own revenue and that it would have to turn to other MCA companies for financing, which is exactly what happened.

76.    With respect to each instance of a new loan, a substantial portion of the new loan was used to repay the outstanding balance of a previous loan with McNider receiving little "new" money for their operations, if any.

77.    Defendants knew that by taking part, either directly or indirectly, in the pyramid scheme that McNider was doomed to fail or default.

78.    Incredibly, Yellowstone's broker, Arca Funding, continued to solicit McNider for additional loans even after it could not pay:

**From:** Leanne <Leanne@arcafunding.com>
**Sent:** Friday, June 2, 2017 5:21 PM
**To:** bruce.mcnider@hotmail.com
**Subject:** Instant Approvals On Renewals!

Hi Bruce,

At Arca Funding **getting additional capital is never a problem**. You never have to wait untill [sic] your 50% paid off. **We have true add on programs, lines of credit options and one of the most aggressive merchant retention programs in the country!**
Call us today at 1-866-749-9661 and find out just how easy it is.

**E.**     **Plaintiffs' Default and the Defendants' Collection Efforts.**

79.     McNider inevitably fell behind on its payments in fall 2016.

80.     Despite the fact that McNider was on the brink of financial ruin, Yellowstone used several methods to extract additional money.

81.     First, Yellowstone retained MCA Recovery to contact McNider and attempt to collect additional payments.

82.     Second, on or around December 28, 2016 Yellowstone obtained a Judgment by Confession against McNider in Erie County, New York in the amount of $314,494.87.   Of this amount, $62,722 was for attorney's fees calculated at 25% of the alleged debt in violation of Code of Ala. § 5-19-10, as well as New York public policy.

83.     In obtaining this Judgment by Confession, Yellowstone filed an Affidavit of Confession of Judgment on December 22, 2016 that was forged.

84.     Specifically, in obtaining its Judgment by Confession, Yellowstone altered the Affidavit of Confession of Judgment—after it was duly notarized—to cure the fatal defects of a sworn instrument.

85.     A person who alters an instrument which affects a legal right, interest, obligation or status with the intent to defraud, deceive or injure another is guilty of second degree forgery under Section 170.10 of the New York Penal Law, which is a Class D felony.   It is a Class C felony under Alabama law.   Code of Ala. § 13A-9-3.

86.     In obtaining this Judgment by Confession through the use of a forged instrument, Yellowstone violated Code of Ala. § 8-19-5 and New York Gen. Bus. Law § 349.

87.     As a direct and proximate result of these actions, McNider is entitled to damages from Yellowstone in the amount of $943,484.61, plus the costs of this suit and reasonable attorney's fees.

**F.      Yellowstone and its Employees Admit That its MCA Agreements are Loans**

88.     In or around early 2016, Yellowstone and other MCA companies responded to increasing lawsuits and regulatory scrutiny by ensuring that their advertising materials were consistent with the language in their sham agreements.

89.     Yellowstone, however, cannot take back the statements it made about its MCA agreements before it learned that telling the truth was bad for business.

90.     Yellowstone has previously admitted in advertising and promotional materials that it was a direct lender and that its MCA agreements are loans. For example, Yellowstone advertises itself as follows:



91.     Yellowstone employees, including its owner, Stern, also have admitted at various times on social media and/or industry forums that Yellowstone is really a lender.

92.     While Yellowstone's employees, at times, have also tried to distinguish MCAs from loans, their description of Yellowstone's MCA program actually reinforces the notion that the transactions are loans.

93.     In or around August 2013, Yellowstone retained a professional marketing company to create promotional videos that were marketed to the public on YouTube.

94.     Yellowstone created a channel for the videos, which it called EZBusinessLoans.[10]

95.     The channel contains 15 videos.

96.     The actors in the videos were all employees of Yellowstone.

97.     The premise of each video is that small businesses cannot get approved for a loan from a traditional bank, but anyone with a pulse can get a loan from Yellowstone.

98.     One of the Yellowstone employees portrayed a character by the name of Dr. Daniel Dershowitz a.k.a. Dynamite Disco Danny.[11]

99.     This video is titled "Bad Credit Business Loans ™ | 855-445-9649." *Id.*

100.    The premise of the video is that Dr. Dershowitz went to Las Vegas after his divorce, whereupon he overindulged, maxed out his credit cards and started dipping into his business account. *Id.*

101.    Dr. Dershowitz then makes the following statements about his experience with a traditional lender and his experience with Yellowstone:

> When the funds got low, I was in over my head.  The only way out was to get a business loan.  So I went to the bank and when they ran my credit, the lady laughed at me.  **So I went online and found Yellowstone Capital.  I applied for a <u>loan</u> on Monday based on my monthly sales and on Wednesday they gave me my money.**  It's crazy because my heartrate is higher than my credit score.

---

[10] EZBusinessLoans, EZBusinessLoans, YOUTUBE, https://www.youtube.com/channel/UCqIxvb 0kQMfrHcaEFM9nNuw/videos?shelf_id=0&sort=dd&view=0 (last visited Nov. 29, 2017).

[11] EZBusinessLoans, *Bad Credit Business Loans ™ | 855-445-9649*, YOUTUBE (Aug. 2, 2013), https://www.youtube.com/watch?v=WsPZSgnms lE&pbjreload= 10.

So if you need money you need to apply right now while their computers are still giving out money to basically any business owner with a pulse. *Id.* (emphasis added).

102.    The video was published on Aug 2, 2013. *Id.*

103.    Below the video is the following link: "CLICK HERE TO APPLY! http://www.yellowstonecap.com/FundsToday." *Id.*

104.    As the video played, Yellowstone displayed subtitles that further described its MCA program:

> Bad credit business loans are, and forever will be, extremely hard to obtain. Luckily, **Yellowstone Capital makes it easy to obtain an <u>unsecured bad credit business loan</u> if you have been turned away by your bank in search of an unsecured bad credit business loan, or unsecured business funding.**
>
> We keep our application process super short, and super easy. Once you submit your application, your business funding offer can be approved in the same day. Many of your clients receive their bad credit business loans in as little as three days.
>
> Been turned away for a small business credit card? **Apply at Yellowstone Capital for a <u>bad credit business loan, also known as a business cash advance</u>, or a merchant cash advance.**
>
> Need money for remodeling, upgrades, or to buy a new location? Our small business loans are easy to obtain for these things.
>
> <u>**Our business loans**</u> are unsecured. There are no set minimum monthly payments, which means there are never any late fees. So what are you waiting for? Click the link at the top of the description to get started with your **<u>bad credit business loan</u>** application today! *Id.* (emphasis added).

105.    Yellowstone created another video titled "Bad Credit Business Loans | 855-445-9649," this one starring a character called Jack the dry cleaner.[12]

106.    As the video played, Yellowstone displayed the same subtitles as those found in the Dynamite Disco Danny and Jack the Dry Cleaner videos, including the following statement:

---

[12] EZBusinessLoans, *Bad Credit Business Loans | 855-445-9649*, YOUTUBE (Aug. 2, 2013), https://www.youtube.com/watch?v=gRNeJhGIhX o&pbjreload=10.

"**Apply at Yellowstone Capital for a <u>business loan</u>, <u>also known as</u> a <u>business cash advance</u>, or a <u>merchant cash advance</u>.**" *Id.* (emphasis added).

107.    Further, in this video the actor states that the loan was for personal reasons. *Id.*

108.    Yellowstone created another series of videos starring an employee who portrays a character by the name of Blake Steven. *See, e.g.*, EZBusinessLoans, *Small Business Loan Rates | 855-445-9649*, YOUTUBE (Aug. 2, 2013), https://www.youtube.com/watch?v=KK1nS-fMfws.

109.    One of the videos is titled: "Small Business Loan Rates | 855-445-9649." *Id.*

110.    Blake makes the following statements in this video:

You mean to tell me there is a businss out there that's lending $120 million in risk free money to Amercia's bsuiness owners.  50,000 f%*cking jobs.  And it's called, it's called Yellowstone Capital. *Id.*

111.    The subtitles for this video state:

As you well know, when banks consider your interest rate, they will look at your collateral when determining your potential small business loan rate. **We will go the extra mile to make sure you can get <u>the best small business loan rates</u> as possible.** We have helped thousands of people get the funding that they need.

**Yellowstone Capital <u>small business loans</u> are easy to obtain and best of all, no collateral is required!** *Id.* (emphasis added).

112.    These videos all link to a loan application Yellowstone's website. *Id.*

113.    On or about April 1, 2013, Stern posted a video titled: "It's Morning in America – Yellowstone Capital Helps Small Business."[13]

114.    The man in the video makes the following statement:

For the past 4 years, Yellowstone Capital has successfully helped small businesses navigate cash flow issues.  With verifiable monthly revenue of just $25,000 through credit card processing or bank statements, **<u>a simple loan</u>** is at your disposal despite FICO score.  We are in this together. Call 877-972-2748 now or visit us at www.yellowstonecap.com *Id.* (emphasis added).

---

[13] Isaac Stern, *It's Morning in America – Yellowstone Capital Helps Small Business*, YOUTUBE (Apr. 1, 2013), https://m.youtube.com/ watch?v=98D9aCaHKbo.

115.   Below the video, Yellowstone described its services as follows:

**We have the money and we want to help. Let Yellowstone Capital lend you a helping hand today and just see how far we can go together.**  All we ask is that you have a business history of at least 6 months and can show monthly revenue of $25,000 or more verified by your bank deposits. Low FICO or other marks on your history will not get in the way of our funding. Call us today at 855-972-2748 or visit our website at http://YellowstoneCap.com *Id.*  (emphasis added).

116.   Yellowstone's MCA program is also described as a loan by its employees on various other social media websites.

117.   Nathaniel Kingsley, marketing director for Yellowstone Capital, wrote an article titled: *How to Get Business Money Fast in the Face of Disaster.*

118.   In the article, Kinglsey described cash advances as follows:

Cash advances work as a sort of line of credit. You have access to a set amount, but if you only wind up needing several thousand, you only pay interest on the amount you used. The 'line of credit' model can prove especially helpful to a business rebuilding from disaster, as unforeseen costs associated with rebuilding can appear as you go.[14]

119.   On October 10, 2012, Yellowstone issued a press release describing a new starter advance program.[15]  In the press release, Mike Samuels, a seasoned representative for Yellowstone since 2009, states that Yellowstone's MCA is a line of credit: "[a]s long as you currently own a business and are generating revenue, … it's likely that we can find you funding. Structured properly, a starter advance can help to establish the same valuable line of credit that a standard merchant cash advance offers." *Id.*

120.   On October 18, 2012, Yellowstone issued a press release to announce a revised ISO program.  The press release stated, in part, that:

---

[14] Nathaniel Kingsley, *How to Get Business Money Fast in the Face of Disaster,* First Class Business (Apr. 18, 2013), http://firstclassbusiness.org/how-to-get-business-money-fast-in-the-face-of-disaster (emphasis added).
[15] *Yellowstone Capital Extends Approvals for Starter Advances,* YELLOWSTONE CAPITAL(Oct. 10, 2012), http://m.yellowstonecap.com/press/release/yellowstone capital-first-to-fund-bank-only-ach-deals/24.

New York-based Merchant Funding Company Yellowstone Capital, LLC (YSC), announced in July that their in-house funding team, that includes 5 independent funders, **would begin to extend their programs to <u>longer terms</u> and <u>better rates.</u>** The response to this has been tremendous and the amount of longer turning, larger amount deals has exceeded all expectations.[16]

121.    On May 12, 2015, Yellowstone posted an article on its blog titled: "Yellowstone Has the Options You Need to Stay Ahead of the Competition."[17]

122.    In the article, Yellowstone references one of its ISO reps, Juan Monegro, stating that Juan "knows firsthand just how valuable it can be to have access to the variety of options that Yellowstone offers.  He works with all sorts of deals, ranging from A and B paper deals to ones that are very high risk, even by C and D paper standards." *Id.*  A, B, C, and D paper are references to the credit risk a lender takes based on a number of factors.

123.    The website Alignable.com launched in January 2014.   Alignable is a free network where small business owners build relationships and generate referrals.   Yellowstone advertises itself as "direct lender" on Alignable:



[16] *Yellowstone Capital's Revised ISO Program Unveiled to Meet The Demand of Premium Accounts,* YELLOWSTONE CAPITAL (Oct. 18, 2012), http://m.yellowstonecap.com/press/ release /yellowstone-capitals-revised-iso-program-unveiled-to-meet-the-demand-of-premium-accounts/31 (emphasis added).
[17] *Yellowstone Has the Options You Need to Stay Ahead of the Competition,* YELLOWSTONE CAPITAL (Nov. 2, 2015), http://yellowstonecap.com/blog/yellowstone-has-options-you-need-stay-ahead-competition/.

*Yellowstone Capital*, ALIGNABLE, https://www.alignable.com/jersey-city-nj/yellowstone-capital# (last visited Nov. 29, 2017).

124.    In 2013, Yellowstone employee, Steve Corlin, also admitted on his Facebook page that Yellowstone's MCAs are loans.   Corlin has been employed by Yellowstone from February 2011 to present.

125.    Specifically, on August 22, 2013, Corlin posted the following: "FOR BEST AND QUICKEST SERVICE YOU CAN REACH ME DIRECTLY ANY TIME DURING THE DAY OR NIGHT.  THAT'S RIGHT GET APPROVED FOR A UNSECURED BUSINESS LOAN 24 HOURS A DAY!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!"

126.    Above and below this post are posts relating to advertisements about Yellowstone's business loans with links to Yellowstone's website.

127.    Corlin also has a linkedin page where he describes his postion at Yellowstone as a "Senior Loan Officer."  *Id.*  Corlin describes Yellowstone's services as follows:

> **The merchant cash advances that we offer are an unsecured business loan alternative.** The money that you get as part of your cash advance can be used for everything from renovation work to bringing in more stock. Our business cash advances are there for businesses of all sizes, and businesses from all different niches. If your business is starved of cash and the day to day running of it is nothing short of an impossible mission, you should think about applying for a cash advance in order to remove those financial constraints, so your business can go on to become profitable and continue to grow once again.[18]

128.    Fabio Giordano is a Funding Specialist for Yellowstone and has been employed from March 2016 to present.  Giordano also admits Yellowstone is a direct lender:

> **I am a Direct Lender!**
> We Fund the UnBankable!
> I want your B-Z Paper![19]

---

[18] Steve Corlin, *Steve Corlin*, LinkedIn, https://www.linkedin.com/in/steve-corlin-a2b47966/ (last visited Nov. 29, 2017) (emphasis added).
[19] Fabio Giordano, *Fabio Giordano*, LinkedIn, https://www.linkedin.com/in/fabio-giordano-5bb06713b/ (last visited Nov. 29, 2017).

129.   Simon Gould is a senior underwriter in Yellowstone's Funding Department, and has been employed by Yellowstone from January 2010 to present.  On his LinkedIn page, Gould admits Yellowstone is a direct lender:

> **As a direct lender** we work hard to secure funding and working capital for high risk small business and merchant cash advance deals short term up to 2 million.

Simon Gould, *Simon Gould*, LINKEDIN, https://www.linkedin.com/in/simon-gould-67171065/ (last visited Nov. 29, 2017) (emphasis added).

130.   Dawanna Terry is employed by Yellowstone as a Senior Financial Analyst.  Terry has worked for Yellowstone from April 2015 to present.

131.   Terry describes her position and responsibilities at Yellowstone as follows:

> **Process Financial Loans For Business To Promote More Working Capital ...**
> Investigate customers information to ensure their (sic) no fraud before funding a contract.  Strong communication and analytical skills[20]

132.   DeBanked.com is a website dedicated to the MCA industry.  DeBanked.com has a forum where users can advertise and/or solicit services.

133.   Yeyfri Garcia is employed by Yellowstone as a Senior Funding Specialist and Senior Member of ISO Development.

134.   On May 12, 2017, a Yellowstone employee posted in a forum on DeBanked.com:

> We believe that EVERY DEAL IS FUNDABLE!! – even high risk deals. **With all of our new benefits we almost GUARANTEE your loan approval. We can get you approved in less than 24 hours.**[21]

135.   Enrique Del Rosario is a Funding Specialist for Yellowstone.  On April 13, 2017, Del Rosario posted in a forum on DeBanked.com that Yellowstone was looking for new ISO's.[22]

---

[20] Dawanna Terry, *Dawanna Terry*, LinkedIn, https://www.linkedin.com/in/dawanna-terry-341186b9/ (last visited Nov. 29, 2017) (emphasis added).
[21] Ygarcia29, *Become an ISO With Our Company!!*, DeBanked (May 12, 2017, 2:19 PM), https://debanked.com/forums/ showthread.php/1182-Become-an-ISO-with-our-company!!.

As part of that post, Del Rosario states that Yellowstone is a "direct lender," offers merchants prepay discounts and has "[v]arious Funding Programs with 1st up to 11th position funding." *Id.* (emphasis in the original).

136. Jay Marte is employed by Yellowstone. Marte also referred to Yellowstone as a "direct lender" that offered 1st-10th position funding and prepay discounts for merchants.[23]

137. Defendant Stern likewise admitted that Yellowstone is a lender in one of his posts on DeBanked.com. In an advertisement for an underwriting position, Stern stated that Yellowstone is "[s]eeking an experienced Underwriter in the Small Business Lending space."[24]

## H.   Damages

138. McNider was essentially trapped by a common tactic used by predatory lenders, which begins with a criminally usurious starter loan and ends in financial catastrophe.

139. Yellowstone knew of the existence of other disguised loans and nevertheless continued to loan monies to McNider, knowing that the proceeds of one loan would be used to pay off monies owed on another and so on a until McNider could no longer afford to make any further payments.

140. McNider entered into two criminally usurious loans with Yellowstone. *See* Exhibit A and B.

141. As a direct and proximate result of each of these loans, McNider has suffered an injury in excess of $75,000.

---

[22] Enriqued, *Direct Lender Looking to Build Relationships With New ISO's*, DEBANKED (April 13, 2017, 3:47 PM), https://debanked.com/ forums/showthread.php/1150-Direct-Lender-Looking-to-build-Relationship-with-new-ISO-s.

[23] Jormanm, *Direct Lend Paying Great Offers For All ISOs*, DEBANKED (April 5, 2017, 12:32 PM), https://debanked.com/forums/show thread.php/1131-Direct-lender-paying-great-offers-for-all-ISOs?p=4847.

[24] Isaacdstern, *Yellowstone Capital / Fundry Seeks MCA Experienced Underwriter*, DEBANKED (Nov. 2, 2015 1:01 PM), http://debanked.com/forums/showthread.php/623-Yellowstone-Capital-Fundry-seeks-MCA-experienced-underwriter.

142.     As a direct and proximate result of each of these loans, McNider paid interest in excess of the 25% maximum interest rate permitted by New York law.

143.     As a direct and proximate result of each of these loans, McNider's employees and owners have been harassed, and McNider has had to defend numerous lawsuits.

144.     Defendants' knowledge of the other loans and participation, directly or indirectly, in the vicious cycle of predatory lending created an indivisible injury for which Defendants are responsible.

145.     As a direct and proximate result of each of these loans, McNider has suffered indivisible injury through loss of goodwill, lost profits, and devaluation of its business.

146.     As a direct and proximate result of each of these loans, McNider has suffered indivisible injury by having its other business loans being called in from legitimate banks, deterioration of its credit profile, and the inability to secure financing to obtain needed inventory and pay its vendors.

147.     As a direct and proximate result of each of these loans, Bruce McNider has also suffered an indivisible injury by having to make substantial withdrawals from personal accounts and secure family loans to keep the business afloat.

## FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

148.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.     The Criminal Activity.**

149.     Defendants have collectively engaged in an unlawful scheme whereby McNider was induced to enter into, and make payments on, criminally usurious loans that Yellowstone knew McNider could not pay off without entering into subsequent criminally usurious loans. When the burden to pay off these subsequent loans become too great, McNider defaulted;

Yellowstone filed a confession of judgment against Plaintiffs, and enlisted MCA Recovery to collect upon the unlawful debts.

**B.      The Legitimate Enterprises.**

150.     Defendants Yellowstone, Arca, and MCA Recovery are the Legitimate Enterprises.  Defendants used these companies as a front to conduct their illegal activities. While these companies serve a legitimate business purpose by providing and collecting high-interest loans to small businesses located in states without usury laws or collecting payments on same, these Legitimate Enterprise were used to issue and collect illegal loans in states that have usury laws.  In order to disguise this criminal conduct, Defendants issued these illegal loans using the auspice of a so-called factoring agreement."  In other words, Defendants used the legitimate business practice of factoring to disguise their loansharking enterprise.

151.     Each of the Defendants had a key role in this scheme.

**C.      The Influencing Enterprise.**

152.     Yellowstone, Arca, MCA Recovery, and Stern form the Influencing Enterprise.

153.     The members of the Influencing Enterprise conspired to fund, issue, and collect on loans disguised as "factoring agreements" given to small businesses.

154.     Although Defendants do not form a legal entity, the members of the Influencing Enterprise are associated-in-fact.

155.     Among other things, Plaintiffs' Agreements were funded by pooling the capital of individual investors, Team AKB, the Legitimate Enterprise and the Influencing Defendants.

156.     Stern assisted in the pooling of the capital to fund the loans.

157.    Yellowstone was funded by the John and Jane Doe Yellowstone Investors, including Team AKB, who conspired with the Influencing Enterprise members to fund the criminally usurious loans.

158.    Stern, as owner of Yellowstone, assisted the Influencing Enterprise by directing the actions of Yellowstone.

159.    Arca Funding assisted the Influencing Enterprise by acting as a broker for Yellowstone.

160.    MCA Recovery was used to collect upon Yellowstone's unlawful debt.

161.    The Influencing Enterprise Defendants each are persons under 18 U.S.C. § 1961(3) because they are individuals or entities capable of holding a legal or beneficial interest in property.

162.    The Influencing Enterprise is a group of individuals and corporations associated in fact, since at least 2016, for the common purpose of funding, issuing, and collecting on usurious loans to Plaintiffs and countless other small businesses.  Thus, the associated-in-fact organization qualifies as an enterprise within the meaning of § 1961(4) and § 1962(c).

163.    The Influencing Enterprise has an existence separate and apart from the Legitimate Enterprises.

**D.     RICO Violations.**

164.    Defendants have violated 18 U.S.C. § 1962(c) and (d) by collecting, and conspiring to collect, an unlawful debt.

165.    The Influencing Enterprise is engaged in interstate commerce as it has had business dealings with others, such as Plaintiffs, who operate in states where no Defendant resides.

-27-

166.     Defendants knowingly and intentionally used the Legitimate Enterprise to fund, issue, and collect on unlawful loans that charged interest rates that are more than twice the interest rate permitted under New York's criminal usury statute.

167.     Defendants are associated with, and/or employed by, the Influencing Enterprise as they serve various functions for the Influencing Enterprise including, but not limited to:

    a.     Arca Funding brokered Yellowstone's Agreements with McNider.

    b.     The John and Jane Doe Investors, including "Team AKB", conspired with Yellowstone to fund usurious loans;

    c.     Yellowstone entered into, and collected upon, several loans with McNider;

    d.     Yellowstone was directed by its owner, Stern, to enter into the usurious loans; and

    e.     MCA Recovery, on behalf of Yellowstone attempted to collect upon the usurious loans.

168.     Defendants' collection on these unlawful debts constitutes a *per se* violation of 18 U.S.C. § 1962(c).

169.     Defendants exhaust every possible avenue to collect the unlawful debt, including:

    a.     Yellowstone's collection of Plaintiffs' aforementioned daily wire payments;

    b.     Yellowstone's use of an illegal Confession of Judgment; and

    c.     Collection calls, texts, and emails by MCA Recovery on behalf of Yellowstone.

170.     The debt that Defendants attempted to collect is unlawful because (1) it violates New York's criminal usury statute, and (2) the rates are more than twice the legal rate.

171.     As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c) and (d), Plaintiffs have suffered, and continue to suffer, substantial injury to their business.

172.     Further, Defendants conspired amongst themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c) by agreeing to conduct and participate in,

directly and indirectly, the conduct of the affairs of the Influencing Enterprise and by collecting upon an unlawful debt.

173.    Defendants committed and caused to be committed a continuous series of overt acts in furtherance of their conspiracy, over a period of many years, including, but not limited to, those acts detailed herein.

174.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered, and continue to suffer, substantial injury to their business as they were forced to pay usurious amounts of interest, and make substantial withdrawals from personal accounts to aid in repayment.

### SECOND CAUSE OF ACTION
#### (Code of Ala. § 8-19-5.)

175.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

176.    Yellowstone willfully and knowingly violated Code of Ala. § 8-19-5 by engaging in unconscionable, false, misleading, and deceptive acts and practices.

177.    Yellowstone's conduct in inducing McNider to enter into the loans involved a series of consumer and commerce related transactions that substantially occurred within the State of Alabama.

178.    As evidenced by Yellowstone's internet postings, Yellowstone intended to provide consumer loans and marketed its product as consumer loans.

179.    This practice is common throughout the industry; as stated in the previously cited CNN article: "One guy...said I could buy a boat with it." *CNN Money, supra.*

180.   Due to the bank statements McNider sent to Yellowstone during the application process, Yellowstone was also aware that loan proceeds were being used for personal reasons, such as Wal-Mart purchases, food, wine and other household goods.

181.   Further, by inducing McNider into entering into loans that it could not repay, and requiring Security Agreements and Personal Guarantees, Yellowstone targeted McNider's personal assets.

182.   The Agreements between McNider and Yellowstone set forth illegal and/or unconscionable collateralized consumer loan transactions.

183.   Because each of the Agreements is a criminally usurious loan in violation of N.Y. Penal Law § 190.40, each of the transactions, including all related instruments, are unenforceable and unconscionable as a matter of law.

184.   The Agreements are unconscionable because they permit judgments by confession in violation of the strong public policy of Alabama.  Code of Ala. § 8-9-11 provides: "All agreements, contracts, or stipulations to confess judgment in any of the courts of this state, to be sued in any county other than that fixed by the venue statutes of this state, or to authorize another to confess judgment in any of the courts of this state made before the commencement of the action in which such judgments are so confessed shall be void, and all judgments by such unlawful confession, or otherwise taken or had in violation of this section, shall be set aside and annulled on motion if made within six months after the entry of such judgment."

185.   Yellowstone also knowingly misrepresented the nature of the fees charged in connection with the loans by representing that the fees were reasonable costs of servicing the loans when, in fact, these fees were merely additional interest charged by Yellowstone in consideration of making the loans.  At the time these representations were made, Yellowstone

knew that the representations were false. Yellowstone made these representations with the intent to deceive McNider, and with the intent to avoid the criminal usury laws. McNider reasonably relied upon these knowingly false and/or misleading representations to its detriment.

186.    Further, the Agreements are unconscionable because Yellowstone knew that McNider would not be able to repay the loans.

187.    Additionally, the following requirements of the Agreements also make them unconscionable and unfair:

    a)   Waive the right to a jury trial;

    b)   Pay  Defendants their attorney's fees at a punitive rate that was not measured by the quantum meruit of fees earned but on the amount in default (Yellowstone only);

    c)   Waive the right to participate in a class action;

    d)   Waive the right to seek legal redress in their home state;

    e)   Execute a Power of Attorney;

    f)   Execute a Security Agreement giving the MCA Defendants a UCC lien on all of McNider's assets;

    g)   Execute a personal guarantee making the individual owner of the business personally liable for any default under the agreement;

    h)   Indemnify the MCA Defendants against third-party claims;

    i)   Waive claims for direct, consequential and punitive damages; and

    j)   Consent to crippling default penalties and enforcement actions.

188.    Yellowstone also violated Code of Ala. § 8-9-11 and Code of Ala. § 5-19-10.

189.    Yellowstone also obtained a Judgment by Confession through a forged instrument.

190.    Yellowstone's conduct was willful, unfair and unlawful.

191.    McNider suffered damages as a direct result of the Yellowstone's unlawful, unfair and deceptive acts.

192.    The Defendants are jointly-and-severally liable for all damages.

### THIRD CAUSE OF ACTION
#### (Contract)

194.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

195.    Section 1.8 of the Agreements provide: "In the event that a court determines that [Yellowstone] has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate in effect hereunder shall automatically be reduced to the maximum rate allowed by applicable law and [Yellowstone] shall promptly refund to Merchant any interest received by [Yellowstone] in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that [Yellowstone] not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law."

196.    Each of the Agreements is a loan transaction.

197.    McNider has paid and, Yellowstone has received, interest in excess of the maximum criminal usury interest rate allowed under New York law.

## FOURTH CAUSE OF ACTION
### (Fraud)

198.   Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

199.   Yellowstone intentionally misrepresented the true nature of the transactions in order to avoid this New York's criminal laws.

200.   Yellowstone knowingly misrepresented that the disguised loans were enforceable when they were illegal under New York law.

201.   Yellowstone collected on these illegal contracts, which created the false impression that the Agreements are legally enforceable and that Plaintiffs are obligated to repay when they were not.

202.   This false impression is material, and Plaintiffs did not reasonably know that the contracts were illegal.  In fact, McNider only became aware of their illegality when informed by counsel in March of 2017.

203.   In addition, Yellowstone falsely represented the market value of the future receivables that Yellowstone purported to purchase.  This stated value was not based on any true market value assessment but rather was a knowingly false representation unilaterally made by Yellowstone in order to disguise the true nature of the transactions.

204.   Yellowstone further knowingly misrepresented the nature of the fees charged in connection with the loans.   Yellowstone falsely represented that the fees were reasonable costs of servicing the loans when, in fact, these fees were merely additional interest charged by Yellowstone in consideration of making the loans.

205.   Yellowstone's misrepresentations were intended to induce reliance because if McNider was aware that (1) Agreements illegal, (2) the market value of the receipts were

incorrect, or (3) the fees charged were disguised interest, McNider would not have executed the documents.

206.    Yellowstone knew that the representations were false at the time they were made.

207.    Yellowstone made these representations with the intent to deceive Plaintiffs, and with the intent to avoid the criminal usury laws.

208.    McNider reasonably relied upon these knowingly false representations to their detriment, as it executed the Agreements and was forced to pay interest in excess of New York's criminal usury threshold.

209.    McNider was directly and proximately damaged by Yellowstone's knowingly false representations by paying interest and principal on criminally usurious loans for which they had no legal obligation to repay.

210.    Yellowstone's conduct was intentional, outrageous and in reckless disregard of McNider's rights.

### FIFTH CAUSE OF ACTION
### (Negligent Misrepresentation)

211.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

212.    Arca and Yellowstone, in holding Yellowstone out as a funder that educates their customers on products that will help their businesses grow, had a special and/or privity-like relationship with McNider.

213.    Due to this relationship, Arca and Yellowstone owed McNider a duty to impart correct information.

214.    In the summer of 2016, when Arca first contacted McNider on Yellowstone's behalf, it informed McNider that Yellowstone provides businesses with the resources they need

to grow and that any transaction would be based on what McNider could afford to pay, and that the disguised loan would be good for McNider's business.

215.   In providing this information, Yellowstone's representative stated that they were providing advice to McNider based on their expertise and knowledge of small business financing needs.

216.   These representations, however, were incorrect because Yellowstone failed to reasonably investigate McNider's financial condition regarding its needs or ability to pay. In fact, McNider soon realized that in its current financial condition, it could not afford to repay the disguised loan without taking on additional loans.

217.   By providing McNider with false information, Arca and Yellowstone breached their duty to impart correct information to McNider.

218.   In providing this specialized information to McNider, it was reasonably foreseeable that McNider would rely upon the information in making its decision regarding whether to execute the Agreements.

219.   Further, McNider did reasonably rely upon Arca and Yellowstone's representations because it decided to execute the Agreements. But for the representations, McNider would not have entered into any of the transactions at issue.

220.   McNider's reasonable reliance upon the representations was to its detriment because as a direct result of the representations, McNider unknowingly entered into usurious transactions that required further usurious transaction to repay, bringing the business, and McNider's personal finances, to the brink of disaster.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs seek an order from this Court:

a) Declaring each of the Agreements a loan transaction;

b) Ordering Yellowstone to repay McNider all interest previously paid to Yellowstone in excess of the applicable criminal usury rate of 25%, including 9% prejudgment interest;

c) Awarding Plaintiffs all principal and interest previously paid to Yellowstone in connection with the criminally usurious loans;

d) Awarding Plaintiffs direct and consequential damages in an amount to be determined a trial, including prejudgment interest;

e) Awarding Plaintiffs treble damages;

f) Awarding Plaintiffs punitive damages;

g) Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues properly so tried.

Dated: 12/29/17

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin (#9984)
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com

*Attorneys for McNider Marine, LLC and John Bruce McNider*